## Township of Millcreek v. Angela Cres Trust of June 25, 1998

50

C.P. of Erie County, No. 12295-2005

*Mark J. Shaw, Evan Edward Adair and Mark Thomas Pavkov*, for Township of Millcreek.

*Eric John Purchase, David B. Snyder, Philip L. Hinerman, Gary Douglas Bax, James D. McDonald, Jr. and Herbert Bass*, for Laurel A. Hirt and Angela Cres Trust.

BOZZA, *J.*, Dec. 16, 2014—This matter is before

the court on the Condemnee Angela Cres Trust of June 25, 1998's (Trust) petition for fees, costs and expenses associated with its successful challenge to Millcreek Township's (Millcreek) amended declaration of taking. Millcreek filed a response in opposition and, following the parties' unsuccessful attempt at mediation, the matter was set for hearing. Upon the completion of the hearing the parties submitted written arguments in support of their respective positions.

This is an extraordinary case. There are comparably few cases brought to trial where the issue is the reasonableness of a request for reimbursement of attorney fees, costs and expenses. Moreover, the focus of Millcreek's challenge to the Trust's fee petition is directed in large measure to the reasonableness of the amount of billable time charged by the Trust's attorneys as well as their hourly rates in a case that went on for seven years. Millcreek also claims that the expenses for which the Trust seeks reimbursement are excessive. This has required, contrary to the wise admonition of U.S. Supreme Court Justice Elena Kagen, in *Fox v. Vice* 131 S. Ct. 2205; 180 L. Ed. 2d 45(2011) "a second major litigation" involving substantial pleadings, pre-trial issues, a three day non-jury trial that lasted significantly longer than the non-jury trial in the underlying condemnation case, and voluminous exhibits that include hundreds of pages of attorney invoices and billing records. Following a comprehensive review of the evidentiary record this court sets forth below its synopsis of factual findings and legal analysis of the issues before it.[1]

---

1. The court's factual findings represent a summary of the core facts in the case as presented in the hearing and otherwise apart of the record. Given the volume of information made a part of the record by the parties that includes such items as the entire transcript of the hearing before the

Findings of Fact

A. Procedural history

1. The declaration of taking was filed by the Township of Millcreek (Millcreek) on June 21, 2005.

2. Preliminary objections were filed by the Angela Cres Trust of June 25, 1998 (the Trust) on August 10, 2005.

3. A motion\n to dismiss preliminary objections and for entry of protective order was filed on November 8, 2005.

4. An amended declaration of taking was filed by Millcreek on January 11, 2006.

5. On February 1, 2006 preliminary objections to the amended declaration of taking were filed by the Trust.

6. Throughout 2006 discovery was ongoing with various disputes arising concerning the issuance of subpoenas and service of interrogatories and requests for production.

7. The parties were ordered to file pre-trial statements in November of 2006 and directed to certify the case for trial accordingly.

8. There was no docket activity on 2007.

9. Millcreek filed a motion to dismiss certain preliminary objections to amended declaration of taking on November 4, 2008 and denied on April 8, 2009 by the honorable Michael Dunlavey[2].

---

Environmental Hearing Board and hundreds of pages of various expert reports, it is not practically feasible or legally necessary to include a complete detailing of all the credible evidence in the case that constitutes the factual record.

2. This case was initially assigned the undersigned in 2005 and reassigned to judge Dunlavey in 2008 and reassigned in 2012 upon judge Dunlavey's retirement.

10. The matter was scheduled for trial for December 15-18, 2009, but began with oral argument on December 14. The actual hearing was conducted over portions of two days before judge Dunlavey and included a visit to the area that was the subject of the condemnation.

11. The trial involved the testimony of four witnesses and lasted less than five hours.

12. Following the court's decision sustaining limited portions of the Trust's preliminary objections dealing with the authority of Millcreek to condemn property pursuant to the second class township code, a notice of appeal to the Commonwealth Court was filed by Millcreek on January 15, 2010.

13. On July 15, 2011 the Commonwealth Court rendered its decision affirming the decision of the trial court.

14. Following the denial of re-argument, a petition for allowance of appeal was filed in the Supreme Court of Pennsylvania on October 6, 2011.

15. On July 30, 2012 Supreme Court entered an order denying the petition for allowance of appeal.

16. On August 3, 2012 Millcreek filed a motion for leave to file a second amended declaration of taking and the matter was heard by this judge.

17. On October 12, 2012 the court entered an order denying Millcreek Motion to file a second amended declaration of taking.

18. More than a year later, on October 21, 2013 the trust filed a petition for fees, costs and expenses.

19. Thereafter, the parties engaged in a process of mediation with the hope in resolving this case as well as

other legal actions related thereto.

20. Following a status conference the court entered an order on July 2, 2014 finding that progress in resolving the dispute through mediation had been insufficient and indicating that the court would proceed to resolve pending legal issues.

21. On July 16, 2014 the court at the request of the Trust, entered a decree re-vesting title of the disputed property in the trust.

22. On July 30, 2014 the court entered its order excluding from consideration in the pending petition fees resulting from the Trust's litigation before the environmental hearing board.

23. On September 4, 2014 the trust filed a supplemental petition for fees, costs and expenses.

24. On September 8, 2014 Millcreek filed a motion to strike condemnee's supplemental petition for fees, costs and expenses.

25. On September 10, 2014 the court entered an order scheduling a pre-trial conference and, thereafter, resolved a motion in limine excluding from consideration at the forthcoming hearing resolution of the Trust's claim for reimbursement of engineering fees.

26. The court entered an order on September 22, 2014 denying Millcreek's motion to strike condemnee's supplemental petition for fees.

27. The case was brought before the court for hearing on October 1, 28 and 29, 2014.

B. History and Nature of the Case

1. Ms. Laurel Hirt is the trustee and apparently the sole beneficiary of the Angela Cres Trust of June 25, 1998.

2. As of the time of the hearing, Ms. Hirt's stock in Erie Insurance, based on the current price per share, was valued at $380 million dollars. Ms. Hirt believes that the current per share price of her stock is too high and she is currently involved in litigation in that regard.

3. Ms. Hirt has additional assets that she values at approximately $5 million dollars.

4. Millcreek Township is a second class township with total general fund revenues in 2014 of approximately $27.1 million dollars and total general fund expenditures of approximately $27 million dollars.

5. Millcreek estimates a year end fund balance of approximately $3 million dollars which does not represent cash on hand.

6. The 2014 Millcreek budget included $400,000 for attorney fees in this case.

7. Ms. Hirt has asked the court to reimburse her for attorney fees and costs in the amount of $2,427,411.12.

8. Millcreek paid its attorneys McDonald, Illig, Jones and Britton (MIJB) and Evan Adair a total of $252,285.75.

9. In order for Millcreek to pay the amount requested it would be required to borrow money, increase taxes or find ways to materially cut its budget.

10. In 1998 the Trust purchased from Ester B. Pomeroy a parcel of land containing approximately forty-four (44) acres for the stated consideration of $420,000.00.

11. The land is located in Millcreek Township

approximately at the intersection of Sterrettania Road and Heidler Road and at that time had a street address of 5834 Sterrettania Road.

12. In 1964 the former owners of the Trust property, Ansil and Esther Pomeroy granted an easement across a portion of the property to Ralph Hammer and Millcreek for the purpose of conducting water from the storm water drainage system to be installed in the "Millfair Heights Subdivision."

13. The easement anticipated the continued use of a natural watercourse or ditch on the Pomeroy's property as a part of the overall storm water management system.

14. Since at least 1993 storm water management in the area of Heidler Road and the subject property was a matter of concern in the township and in 1996 there was significant flooding on property in the area following what was characterized as a "100 — year storm."

15. The storm water management system in the area of the subject property was dependent, in part, on water being directed to and through a channel or water course located on the Trust property and it is a portion of this channel that is the subject of this condemnation action.

16. In 2004 and 2009 there were additional flooding incidents where the inadequacy of the storm water management system was apparent.

17. It is Ms. Hirt's belief that the flooding problems of more recent vintage are attributable to increased residential development in the area and that the current storm water management system is inadequate to deal with the increased volume of water generated by surrounding residential subdivisions.

18. In 1998 Millcreek planned to construct a storm sewer along Heidler Road and planned to make improvements to a watercourse (the channel) on the Trust's property.

19. In 1999 Millcreek requested that the Trust grant an easement to allow the Township to carry out improvements to the channel and facilitate the development of the planned sewer project.

20. More specifically, it appears that by 2001 Millcreek was recommending the adoption of the Heidler Road Channel Improvement project (the project), formulated by Hill Engineering, that would include widening, deepening and perhaps straightening the channel on the Trust property.

21. At various times prior to pursuing condemnation Millcreek officials provided information about the project to Ms. Hirt and her attorney, James McDonald and responded to her substantial requests for information and many questions.

22. It is apparent that Ms. Hirt had numerous concerns about the project and she hired Urban Engineers to review the plan proposed by Millcreek.

23. In particular Ms. Hirt believed that the project would not effectively address the flooding problems in the area and would lead to additional flooding on Trust property and perhaps on the property of adjoining land owners.

24. Ms. Hirt also was concerned that additional safety risks would result from the project and in particular she had concerns about the wellbeing of her neighbor Ester Pomeroy who resided on a portion of the original property purchased by the Trust in 1998.

25. It was also her belief that the project would cause additional flooding on the property and would lead to the further collection of surface water and present a health risk by facilitating the breeding of disease carrying mosquitoes.

26. Furthermore, Ms. Hirt was concerned that if the project was allowed to go forward as planned that she could be held personally liable for any harm caused to her neighbors or others as a result of increased flooding.

27. Because of considerable discussion, information gathering and study by Ms. Hirt and Millcreek, there was almost no progress with bringing the project to fruition and Ms. Hirt ultimately denied the request for the easement.

28. Ms. Hirt has indicated that under no conditions would she allow the project as planned to be realized.

29. It continues to be Ms. Hirt's position that the current storm water management system that incorporates the use of the channel is inadequate and not safe and that the more prudent and effective approach would be a system that incorporated piping storm water along Sterrettania Road in a manner that would ultimately avoid the continued use of the channel.

30. Millcreek has continued to pursue the project which it believes is more cost effective and has estimated the cost being in the neighborhood of $156,000.

31. It is Millcreek's position that the approach favored by Ms. Hirt would be significantly more expensive and estimates the cost to be in the neighborhood of $5 million dollars.

32. As noted above in 2009 during the pendency of the underlying condemnation action, there was a significant

incident of flooding on Trust and neighboring property and there remains a current risk of flooding in the area following a significant rain event.

33. As a consequence of not being able to obtain an easement to carry out the improvements in the channel on Trust property Millcreek filed a declaration of taking on June 21, 2005 followed by an amended declaration of taking on January 11, 2006.

34. The value of the easement interest sought by the taking is $9000.

35. The pecuniary value of any future damage to Trust property as a result of additional flooding from the proposed project is not known.

36. The likelihood or extent of potential harm to other property or persons that might result from the proposed taking and improvements to the channel was not determined in the Condemnation hearing nor otherwise established in the record.

37. During the relevant period of time the Trust challenged the Department of Environmental Protection's (DEP) decision to grant Millcreek a permit to go forward with the project.

38. Following a hearing before the Environmental Hearing Board (EHB) in 2007 the EHB suspended the activity authorized by the permit and directed DEP "to determine whether the project can be completed without resulting in flooding of downstream properties."

39. The Trust's subsequent request to be awarded attorney fees was denied by the EHB.

40. Just prior to the 2009 hearing the attorneys for the

Trust after meeting with certain experts, experienced what Mr. Bass described as an "eureka" moment, and realized that the proposed project channel was not aligned with the current one on the Trust property.

41. Ostensibly believing that these were the two best theories Mr. Bass decided to pursue two of the preliminary objections that related to compliance of the project with the second class township code and defer resolution of the balance of the preliminary objections to a future hearing if necessary.

42. Following the hearing in December 2009, the court sustained the two preliminary objections at issue essentially finding that the proposed project location was outside the existing watercourse and therefore did not meet the requirements of §2702 and §1513 of the code.

43. The underlying issues concerning the efficacy of the project were not resolved nor was there a determination of whether it would cause increased flooding in the future.

44. In particular the court did not reach any of the preliminary objections asserting that the actions of the Millcreek in condemning the property were "arbitrary and capricious or an abuse of discretion" or that the project violated various Pennsylvania or Federal environmental statutes or regulations.

C. Attorney Engagement

1. When Laurel Hirt became aware of Millcreek's pending condemnation action against Trust property she contacted attorney James McDonald managing partner of the McDonald Group LLP (TMG).

2. Mr. McDonald and TMG had a long standing professional relationship with Ms. Hirt and had handled

various legal matters on her behalf and had been involved for a number of years in advocating her position with regard to the project.

3. TMG proceeded to review the Condemnation action in the form of a declaration of taking and initially responded as the circumstances of the law suit required.

4. However following discussions with Ms. Hirt, attorney McDonald advised her that his firm was not in a position to represent her in the condemnation action as it was "out of his league."

5. None the less at Ms. Hirt's request, TMG did agree to assist another firm of her choosing that may ultimately represent her in the condemnation action.

6. For some time apparently Ms. Hirt had followed the progress of another condemnation case that had been reported in the national press and she contacted a Florida attorney involved in the case.

7. Although that attorney declined to be involved, he referred her to attorney Herbert Bass in Philadelphia, Pennsylvania, a partner in the firm of Fox-Rothschild (FR).

8. The Trust and Ms. Hirt individually secured the services of Mr. Bass and his law firm Fox-Rothschild (FR) by signing an engagement letter.

9. TMG agreed to serve as co-counsel with FR in defending the Eminent Domain case initiated by Millcreek.

10. TMG began representing the Trust in this action on June 24, 2005 and FR and Herbert Bass began representing the Trust and Ms. Hirt on July 25, 2005.

11. Ms. Hirt in signing the engagement agreement with

FR accepted its fee structure and charges for costs of the litigation.

12. Specifically she agreed to pay FR an hourly rate of between $180 and $510 for attorney time and $90.00 to $200.00 for paralegal time and also acknowledged that those rates may change as circumstances require.

13. With regard to TMG the hourly rate Ms. Hirt was charged varied in amounts up to $300.00 per hour for attorney services and up to $175.00 per hour for paralegal services.

14. With regard to FR, Ms. Hirt was advised of and accepted the team approach to managing litigation that the firm utilized in representing clients in Eminent Domain cases.

15. Prior to securing the services of FR, Ms. Hirt looked for attorneys in Erie County but concluded that those that she would consider had, for one reason or another, a professional conflict which would preclude representation of the Trust.

16. Both law firms, TMG and FR billed the trust periodically for substantial amounts and Ms. Hirt paid those bills in timely fashion, apparently without any concern about the nature or extent of the charges.

17. Herbert Bass is an attorney with extensive experience in representing clients in condemnation cases and his expertise is widely recognized throughout Pennsylvania and he has co-authored a well known treatise on Eminent Domain law.

18. FR has an Eminent Domain Law Group, chaired by Mr. Bass and comprised of litigators who practice almost exclusively in that area.

19. They utilize a "team" approach to Eminent Domain litigation that includes attorneys in various areas of practice including most notably environmental law.

20. Phillip L. Hinerman is a partner in FR and a member of the "team" that represents the Trust. He is a highly regarded environmental law litigator with extensive experience in eminent domain cases and real estate maters.

21. Mr. Bass and the FR condemnation group have a national condemnation practice and have successfully handled eminent domain cases in many jurisdictions throughout the country.

22. The FR eminent domain group is a formidable opponent in condemnation cases that will effectively formulate a comprehensive set of preliminary objections and in the process of litigation will "overwhelm you with discovery."

23. James D. McDonald Jr. is the managing partner of TMG and an attorney with extensive experience in complex litigation.

24. Mr. McDonald is widely recognized in the local bar as an outstanding attorney and a leader in the professional legal community.

25. Although Mr. McDonald's practice does not focus on Eminent Domain law, he has limited prior experience in condemnation cases and has had broad experience in local courts and knowledge of, the local legal community and the norms of local practice.

D. Nature of the Condemnation Action

1. The declaration of taking filed by Millcreek involves a real estate parcel of .618 acres of the overall forty four

(44) acre property purchased by the Trust in 1998.

2. It is largely comprised of a channel that appears to be a natural water course that traverses behind certain structures on the property. A driveway crosses the channel providing access to the larger portion of Trust lands. In addition Millcreek sought a construction easement over an adjacent small portion of land to be used to facilitate making the improvements to the channel.

3. Eminent Domain is a specialty area of the law that has certain practice rules that distinguish it from other forms of civil actions.

4. In particular, preliminary objections serve a different purpose from their use in other civil actions and are used to challenge the right of the government to take property.

5. Most litigation in this area has to do with establishing the value of real estate that is the subject of a condemnation.

6. Very few cases actually center on a challenge to the right to take the property.

7. It is difficult to prevail in "right to take" cases and the use of preliminary objections is a critical component of a legal strategy in such cases.

8. In this case extensive preliminary objections were filed on behalf of the trust with the goal of effectively challenging the right of Millcreek to condemn the parcel of the Trust's property at issue.

9. The course of litigation proceeded with challenges to the preliminary objections by Millcreek that required legal research, brief writing and argument before the court.

10. Thereafter, there was an extensive period of discovery that involved taking of a limited number of

depositions and the exchange of a substantial amount of written documentation, the service of interrogatories and the issuance of subpoenas.

11. Because at least some of the issues centered on technical questions with regard to proper storm water management practice and related issues, it was necessary for the Trust to retain engineering experts to support its position.

12. Ultimately the case was set for a non-jury trial and a hearing was conducted before the court which resulted in a favorable disposition to the Trust with regard to two of the preliminary objections with the balance of those preliminary objections deferred for future consideration in the event the court's decision was over turned.

13. The case then proceeded on appeal to the Commonwealth Court and ultimately a petition for allowance of appeal was filed by Millcreek to the Pennsylvania Supreme Court.

14. In addition to the condemnation action these parties were also simultaneously involved in other litigation.

15. Other cases include:

a. A lawsuit filed challenging of the granting of a permit by the department of environmental protection and heard by the environmental hearing board;

b. A lawsuit seeking damages and an injunction against Millcreek alleging violations of various Pennsylvania statutes with regard to storm water management;

c. A professional negligence action filed by the Trust against Hill Engineering asserting that the firm and its engineers improperly designed a system for storm

water management on Heidler Road in 1999;

d. An action by the Trust against Millcreek School District involving a discharge of storm water on the Trust property and seeking both monetary damages and injunctive relief;

e. A Pennsylvania Sunshine Act law suit against Millcreek.

16. All of these actions involve, to one degree or another, matters of concern similar to those asserted in the condemnation action and for the most part they are directed towards accomplishing the goal of having Millcreek adopt a different approach to storm water management in the Heidler Rd. area.

17. In response to the declaration of taking and the amended declaration of taking the Trust filed extensive preliminary objections challenging Millcreek's right to condemn the property.

18. In both instances Millcreek was taking an easement interest in the property for the purpose of improving the channel as a part of an overall effort to improve storm water management in the area.

19. The preliminary objections filed in response to both declarations of taking were similar in nature setting forth both factual and legal averments and were directed towards defeating Millcreek's right to condemnation.

20. In general the preliminary objections as set forth in response to the amended declaration of taking challenged the condemnation on the basis that Millcreek:

a. Lacked the authority to take the property pursuant to various sections of the second class township code,

b. Failed to comply with state and federal law;

c. Abused its discretion and acted arbitrarily and capriciously.

21. With regard to each general category the Trust enumerated a plethora of specific allegations that it believed entitled it to prevail.

22. At the time of trial however the court proceeded to take evidence with regard to two of the Trust's theories advanced in the preliminary objections and went on to rule that Millcreek had failed to meet certain requirements of section 2702 and section 1513 of the second class township code.

23. More precisely the court ruled that

a. The land was condemned to create a new system or facility rather than improving an existing one and therefore didn't comply with section 2702 and;

b. Under section 1513 the township is not authorized to create a new channel but only to widen and deepen watercourses.

24. The court reserved consideration of the balance of the preliminary objections (At least twenty one (21), depending on how one actually catagorizes the numerous allegations) until such time it became necessary in the event that its decision was overturned on appeal.

25. On appeal to the Commonwealth Court the court's decision was affirmed and Millcreek's petition for allowance of appeal was denied by the Pennsylvania Supreme Court.

26. There was no adjudication of the balance of the

Trust's numerous preliminary objections.

E. Attorney Fees and Expenses

1. An eminent domain case involving a challenge to a declaration of taking as opposed to a case involving a challenge to the value of the property is unusual and requires a practitioner with knowledge of the unique role of "preliminary objections" in the litigation process.

2. While the use of preliminary objections in eminent domain cases is procedurally different than in other civil cases and serves a different purpose, there is nothing inherently complex about their use as vehicle to challenge a government taking.

3. In eminent domain cases preliminary objections are intended as a way to expeditiously resolve both factual and legal challenges to a condemnation.

4. Unlike other civil actions they serve as the pleading by which an aggrieved party asserts facts in support of its position.

5. Preliminary objections must be filed within thirty days following the filing of the declaration of taking unless the court grants an extension.

6. All preliminary objections must be raised at one time.

7. Here, ostensibly because of a service issue, they were filed fifty (50) days after Millcreek filed its declaration of taking.

8. A second set of preliminary objections to the amended declaration of taking was filed more than five months later.

9. The preliminary objections filed by the Trust included contested factual allegations that required resolution by

the taking of evidence before the court.

10. Like the filing of preliminary objections in conventional civil actions, their use in a condemnation case, although procedurally different, is the vehicle for challenging the legality of the government's exercise of its condemnation power.

11. There is nothing in the record to indicate that, except for preliminary objection practice, a condemnation case involving discovery issues and non-jury trial practice requires a practitioner with a particular skill set other than would be necessary for any competent civil trial lawyer.

12. Particular expertise in eminent domain cases is not required to pursue post trial practice or appellant advocacy.

13. FR through Mr. Bass, Mr. Heineman and the other attorneys in its Condemnation Law Group had the necessary expertise to represent the Trust's interest.

14. The hourly rates charged by FR for the services provided by Herbert Bass and Philip Heineman are not within normative rates charged by attorneys in Northwest Pennsylvania for similar services.

15. The hourly rates charged by James McDonald and the other attorney members of TMG are within normative rates charged by attorneys in northwest Pennsylvania for similar services.

16. The hourly rates charged by TMG for paralegal Cynthia Welch are not within normative rates charged for paralegals in northwest Pennsylvania for similar services.

17. The fees charged by FR for Mr. Bass, Mr. Heineman and generally for the other attorneys and paralegals involved in the case are within the normative rates charged

for such services within the Philadelphia area.

18. The area where one might reasonably look for an attorney to handle a case challenging a declaration of taking is not limited to a particular Pennsylvania county.

19. The record is insufficient to conclude that other attorneys capable of handling this kind of case were not available outside of Erie and Philadelphia.

20. With the exception of the Trust's own expert witness there is nothing in the record to indicate what other practitioners in eminent domain cases outside the Erie and Philadelphia areas charge for such work.

21. The Trust's expert witness, William Bresnahan, who practices in Alleghany County and focuses on Eminent Domain cases charges a maximum rate of $350.00 per hour to private clients.

22. Here the FR attorney selected by the Trust, Herbert Bass, a most capable and highly regarded eminent domain practitioner had only tried two other condemnation cases involving preliminary objections.

23. It appears that the attorneys of TMG had no experience trying eminent domain cases involving preliminary objections.

24. Capable Erie area attorneys were available to handle cases of this type at hourly rates of no more than $350.

25. The invoices and /or time records of both FR and TMG for the work performed on behalf of the Trust and Ms. Hirt were expressed in broad categories that included various professional activities, generally referred to as "block billing".

26. The invoices and /or time records of FR and TMG

contained numerous entries for matters not directly related to the eminent domain case totaling tens of thousands of dollars.

27. A significant amount of billed time was for activity useful in other cases being pursued by the Trust and it is not possible on the record before the court to attribute the significance of such time to one or more of the cases involved.

28. There is nothing inherently improper or unethical about the use of block billing so long as the client has no objection.

29. In the absence of explanatory testimony, the use of block billing precludes an objectively accurate determination of the reasonableness of time expended on particular tasks or the necessity of a particular attorney related activity.

30. Ms. Hirt had no objection to the use of block billing by Trust's attorneys and did not question the accuracy of the entries.

31. The number of billable hours expended by the Attorneys representing the Trust was exceedingly high.

32. Over the course of the litigation thirty six (36) attorneys were involved at various times and to varying degrees in doing work for the Trust.

33. An unusually large amount of time attributable to group meetings was billed to the Trust, without sufficient justification in the record.

34. In one instance in June 2009 the Trust paid attorney's fees in the amount of $50,000.00 for one two day meeting attended by five lawyers and a paralegal.

35. In October 2009 Ms Hirt paid another $33,000.00 for a meeting attended by six lawyers and one paralegal.

36. At that time of the October meeting there were no scheduled legal proceedings in this case until December and briefing on pending motions had been completed.

37. With regard to those meetings three (3) attorneys billed over fourteen (14) hours each per day.

38. Court appearances were frequently attended by more attorneys representing the Trust then the matter required including both Common Pleas and Commonwealth Court arguments where typically no more one attorney is allowed to address the court.

a. In December 2005 an argument by the court was attended by three attorneys representing the estate all of whom billed for their time, including time preparing for the argument and only one attorney addressed the court as would be expected. Millcreek was represented by one lawyer.

b. On May 17, 2006 a hearing on a discovery issue that lasted about an hour was attended by two attorneys and a paralegal. Millcreek had one lawyer.

c. On April 3, 2009 the Trust was represented by three lawyers and a paralegal at hearing on a preliminary matter and Millcreek was represented by one. The Trust was billed a collective $1235 per hour, Millcreek was billed $165 per hour.

d. At the December, 2009 hearing the Trust was represented by four lawyers and a paralegal billing collectively more than $2000 per hour while Millcreek was represented by three lawyers and a paralegal billing

collectively $675 per hour.

e. The December hearing dealt solely with the two issues essentially related to the location of the channel and the location and extent of the project improvements.

f. At the argument before the Commonwealth Court the Trust was represented by two lawyers and a paralegal billing Ms. Hirt collectively more than a $1000 an hour. Only one attorney is normally allowed to participate in oral argument.

39. An excessive amount, more than $45,000, was spent on travel.

40. The Trust originally sought reimbursement of more than $250,000 for costs and expenses associated with both the condemnation case and the Environmental Hearing Board (EHB) matter. This amount is excessive and is approximately equal to the total amount of attorney fees and costs expended by Millcreek in this litigation.

41. The amount requested for costs includes more than $70,000 for making copies.

42. All of the costs and expenses were paid by Ms. Hirt without question.

43. The Trust's request includes more than $280,000 in attorney fees for time expended on cases other than this case contrary to what was attested to in support of the fee petition.

44. Millcreek's fees and costs in this case totaled $258,934.

45. The amount of the Trust's request for reimbursement is almost ten times the amount expended by Millcreek.

46. There were numerous other aspects of the fees charged by the Trust's lawyers that call in to question the reasonableness of the amount sought for reimbursement:

a. Excessive group meetings totaling $234,401 in attorney fees.

b. A majority of work carried out by firm partners who commanded the highest fees.

c. Pervasive duplication of effort, including such activities as redundant document and pleading reviews, lawyer to lawyer consultations and meetings, with multiple attorneys and paralegals involved in the same matters without any justification in the record

d. Numerous time entries those were generalized and vague.

e. A substantial amount of time for which the activity was redacted.

f. Charges of more than $40,000 to the Trust for time expended on administrative tasks such as organizing file boxes, creating document indexes and obtaining copies of documents.

47. A substantial amount of billable time, as set forth in testimony and exhibits, was for work that was useful in other legal matters being pursued by the Trust. The use of "block billing" and the lack of extensive entry specific testimony make it impossible to more precisely evaluate these instances.[3]

## Legal Analysis

---

3. The billing time within this category is more completely described in the testimony and expert report of Arthur H. Stroyd, Esq.

## A. Introduction

The record in this case is replete with evidence concerning the billing history of the law firms representing the Trust and Ms. Laurel Hirt. The Trust through Ms. Hirt, the trustee and beneficiary, obviously sought out and retained what it believed to be the best available legal talent to respond to the declaration of taking filed by Millcreek.[4] Ms. Hirt was prepared to pay for the costs of those services and over the course of the litigation claims to have incurred attorney fees and costs in the amount of $3,359,900.33 including the matter before the EHB.[5] Following a legal challenge to the amount of fees the Trust paid to attorneys for work done in environmental law process and corrections made for erroneous charges, the amount sought was reduced to the overall amount of $2.4 million.

Although the hourly rates of Mr. Bass and Mr. Hinerman far exceeded the hourly rate of attorneys who do comparable work in Erie County, it is evident that the Trust was prepared to pay its legal representatives whatever they, the lawyers, believed was necessary. Ms. Hirt never put any limits on what could be expended and as the record unequivocally reveals, there never was any question as to the time expended by either FR or TMG nor was they any challenge to the amounts they charged, hourly or otherwise, for the services rendered. From the law firms' perspective this was a most favorable business

---

4. From the very beginning Ms. Hirt sought to hire out of town counsel and in particular a lawyer from Florida who had apparently been very successful in an eminent domain case that had received broad attention. And when he was not available she was referred to and then sought out Herbert Bass.

5. The fees paid by Ms. Hirt in the other cases related to storm water management and related issues, including the action against a Hill Engineering are not the subject of this proceeding.

relationship — $3 million plus in billings and not a single critical inquiry let alone a complaint. From the Trust's perspective it demonstrates both immense confidence and trust in its attorneys as well as its very favorable financial position.

This case does not require the court to judge the wisdom of Ms. Hirt's financial decisions on behalf of the Trust. Nor is it a challenge to Ms. Hirt's right to secure legal counsel of her choosing and to pay the Trust's legal representatives any particular amount to act in its defense. Those are matters solely within her purview of individual responsibility as trustee. Rather the case before the court centers singularly on how much of the Trust's legal expense should be paid by the governmental entity that failed it its effort to "take" a limited easement interest in a very small portion of her property.

This case, in its current posture, is also not concerned with the wisdom of Millcreek's decisions to pursue the project in the manner in which it chose, as opposed to some other remedy to the longstanding flooding issue in the Heidler Road area. Much has been said throughout the course of this litigation about what the best way to address the flooding issue should be. Millcreek remains adamant that the project offered the most cost effective approach while Ms. Hirt continues to firmly believe that it will only make matters worse for Trust property and her neighbors and is a poor long term solution to storm water management in the area. Both sides have retained experts to evaluate the project who came to very different conclusions. The history and course of this dispute clearly demonstrates that compromise was not within either party's scope of serious consideration. Both parties aggressively pursued their respective positions and sometimes without apparent

advantage.[6]

There are, however, consequences to resolving important practical community problems such as storm water management and other environmental concerns, by resorting to the litigation process and they are often not good. Aside from the inherent delay in effectively addressing an important issue — here the flooding problem has continued for at least twenty years — the cost, both financial and emotional, can be entirely disproportionate to the utility of the outcome, anticipated or not. This case represents a sobering example of this reality. Although each party to this dispute may believe that no expense or effort should be sparred to prove that its position is correct, that is not a luxury most people or for that matter most communities, can afford. None the less it was their absolute legal right to do so. However, the question of who should pay for the cost of this longstanding conflict is another matter and now before the court for resolution.

## B. The Law

In almost all civil cases in Pennsylvania each party to a dispute pays his or her own legal fees and expenses regardless of the outcome. *Trizechahn Gateway LLC v. Titus*, 601 Pa. 637, 652, 976A.2d 474, 482-83(2009) (holding that, absent limited exceptions, a litigant cannot recover counsel fees from an adverse party). Referred to as the "American" rule it is intended to avoid the kind of fee shifting that might lead to an unjust distribution of the expense of litigation pursed in good faith and discourage people from pursuing legitimate legal interests. Pennsylvania provides for an award of attorney fees and

---

6. Millcreek's unsuccessful effort to pursue a motion for leave to file a second amended declaration of taking after having its condemnation defeated is noteworthy in the regard.

costs in limited circumstances including where a statute authorizes it. 42 Pa.C.S.2503.

The Eminent Domain Code provides such an exception in order to make whole a litigant whose property has been improperly taken by the government in a condemnation action. 26 P.S.1-406, 1-408.[7] More precisely the Eminent Domain Code states that a party who has successfully challenged the governments' right to take private property through the "preliminary objection" process is entitled to be reimbursed for the "reasonable appraisal, attorney and engineering fees[8] and other costs actually incurred because of the condemnation proceedings." 26 P.S.1-408

The language of § 1-408 is instructive as it indicates that a successful litigant is to be reimbursed or paid back for fees and costs incurred, but at the same time limits reimbursement to those fees and costs that are

---

7. Sections 1-406 and 1-408 of the Eminent Domain Code, repealed by P.L. 112, No. 34 § 5(2), effective September 1, 2006, apply in the instant case because the trust's preliminary objections were filed on February 1, 2006, before P.L. 112, No. 34 § 5(2) went into effect.

Sections 1-406 and 1-408 were replaced by 26 Pa.C.S. § 306, which provides in pertinent part:

(g) Costs and expenses.

(1) If preliminary objections which have the effect of terminating the condemnation are sustained, the condemnor shall reimburse the condemnee for reasonable appraisal, attorney and engineering fees and other costs and expenses actually incurred because of the condemnation proceedings.

(2) The court shall assess costs and expenses under this subsection. The new provision no longer grants a court discretion to refer the ascertainment and assessment of costs, expenses and damagers to viewers. The provision from former Section 1-408 regarding the re-vestment of title to a condemnee by agreement without the filing of a declaration of relinquishment is now provided for at 26 Pa.C.S. § 308(e). Consequently, for present purposes, former Sections 1-406 and 408 and current Section 306 are essentially the same.

8. The Trust has also requested that it be reimbursed for the costs of its experts and a hearing on that matter has been deferred to allow for the further exchange of information.

"reasonable." Moreover, it limits reimbursable amounts to those fees and costs that have been "incurred because of the condemnation proceedings." *Id.* If they had been incurred for some other reason they are obviously not recoverable. While it is likely that in every case that qualifies for reimbursement some amount of fees and costs must be awarded the precise amount will depend on the circumstances of each case. Here there is no question that the Trust prevailed consistent with the threshold requirement of the statute and therefore is entitled to some amount of reimbursement of the fees and costs it paid. However, as Millcreek has claimed, there is a serious question as to how much that should be.

The section of Eminent Domain Code authorizing the reimbursement of fees and costs does not define the term "reasonable" nor does it provide any criteria for the court to consider when trying determining the reasonableness of the successful litigant's claim. *See* 26 P.S. § 1-408. And while there is some guidance in this regard in the case law, ultimately the decision rests on the court's exercise of its discretion. It has long been established that appellate courts upon review of a trial court's decision are deferential to these determinations unless an award of fees is not supported by the record or is the product of bias or some other inappropriate consideration and therefore an abuse of discretion. *Samuel-Bassett v. Kia Motors* 613 Pa. 371, 455, 34 A.3d 1, 54 (2009).

Importantly, it is solely the record before the court that must provide the evidence for the court's conclusions and the burden of establishing reasonableness and therefore creating a supportive record is entirely on the petitioner. The Trust has the burden of proving its entitlement to be reimbursed for the fees and expenses it expended. *See,*

*Jones v. Muir*, 515 A.2d 855, 859 (Pa. 1986). In other words it is up to the Trust to prove by the fair preponderance of the evidence that it should be reimbursed by Millcreek in the amount of approximately $2.4 million. To meet its burden, the Trust must submit evidence supporting the reasonableness of hours worked and rates claimed. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).[9]

The Pennsylvania Supreme Court has identified core factors to be taken into consideration in determining the reasonableness of an award of counsel fees. In *In Re Trust Estate of LaRocca*, the court noted that the following criteria must be considered by the trial court when determining the reasonableness of a claim for attorney fees:[10]

1) The amount of work performed;

2) The character of the services rendered;

3) The difficulty of the problems involved;

4) The importance of the litigation

5) The degree of responsibility incurred;

6) Whether a fund was created by the attorney;

7) The professional skill and standing of the attorney(s);

8) The results the attorney was able to obtain

---

9. Our Commonwealth Court has recognized that it is appropriate to look to the federal courts for guidance on how to handle statutory fee provisions. *See, e.g., Twp. of S. Whitehall v. Karoly*, 891 A.2d 780, 785 (Pa. Cmwlth. 2006).

10. While the Supreme Court did not address separately the question of costs and expenses it would appear that a similar application of these criteria is in order.

9) The ability of the client to pay a reasonable fee for the services rendered

10) The amount of money or value of the property in question.

*In re Trust Estate of LaRocca*, 431 Pa. 542, 246 A.2d 337 (1968).

In *LaRocca* the Supreme Court made special mention of the particular importance of the amount of money or value of the property in question as a consideration for determining the reasonableness of an award of fees; actually listing it twice in its opinion. *Id.* It is important to note that these are not the only factors for consideration but they are those that frame the court's analysis in a fee dispute case. Nor does each necessarily have application in every case or, where it does, the same degree of significance. Since the nature of the underlying dispute is different in each case and the circumstances of legal representation variable, it is always necessary for the court to be mindful of the overall context of the dispute and adjust its analysis accordingly. The Pennsylvania Commonwealth Court has recognized the applicability of the *LaRocca* factors in condemnation cases where attorney fees are awarded pursuant to 26 P.S. § 1-408. *See In re Condemnation by Urban Redevelopment Authority*, 452 A.2d 1113, 1116-17 (Pa. Cmwlth. 1982); *see also In re. Condemnation by the Redevelopment Authority of Lawrence County*, No. 2774 C.D. 2010 (Pa.Cmwlth. February 22, 2013).

·C. Credibility and Expert Testimony

The record before the court is substantial and includes three days of testimony and the receipt into evidence of numerous exhibits comprised of thousands of pages of documents, albeit with numerous duplications. Of central

importance to the court's determination is the billing and time records of both FR and TMG. Their submission, together with the testimony of Ms. Hirt, Trust lawyers and expert witnesses, constitutes the heart of the Trust's evidence of the reasonableness of the fees, costs and expenses for which it seeks reimbursement. Millcreek has challenged the Trust's position by presenting both lay and expert testimony and numerous exhibits. As one would assume in a case where the amount of the fee request in controversy is so significant and the nature of the underlying dispute longstanding and contentious, there is a clear delineation of the parties' very divergent positions.

As is often the case for a fact finder, the determination of who to believe and what information to accept as a true reflection of reality is an ongoing challenge. It takes on particular significance when, as here, resolution of the entire case requires the court to determine the veracity and accuracy of key witness testimony and in particular the testimony of witnesses who claim to be experts with regard to pivotal issues. It is firmly established in the common law that credibility determinations are left to the sound discretion of the trial judge acting as jury. *Pennsylvania Game Commission v. Benek* 32 Pa. Commw. 133, 137, 378 A.2d. 497, 499 (1977). A trial judge, acting as fact finder, has received the evidence in the unique context of the adversarial setting observing witnesses testify and responding to the probing inquiry of the opposition and perhaps the court itself. Appellate Courts in Pennsylvania, recognizing the challenges of making important credibility determinations and the unique position of the trail court, accept the credibility decisions of the trial judge where the record supports the court's conclusions and where such determinations are appropriately explained. *See, In Re Condemnation by Urban Redevelopment Authority*

590 Pa. 431, 913 A.2d 178 (2006); *Harrisburg v. Dauphin County Board of Assessment*, 51 A.3d 275, 280 (2012).

Necessarily, where the core issue is the reasonableness of professional conduct, expert testimony will be of critical importance and that is certainly true in this case. However, the court is not bound to accept such testimony nor determine the fee in accordance with the position espoused by experts. *Robbins v. Weinstein* 143 Pa. Super 307, 314, 17A.2d. 629, 633 (1941). And as one would expect, the experts for both sides in this dispute, all very qualified lawyers, have provided completely opposite points of view with regard to the reasonableness of the Trust's request. In such circumstances assessing the credibility of these witnesses must be a threshold consideration. After close scrutiny of each expert's testimony and a careful review of their reports and supportive documentation in the record this court concludes that the position advanced by Arthur H. Stroyd Jr. on behalf of Millcreek is considerably more compelling than that of either William P. Bresnahan or James T. Marnen who testified on behalf of the Trust.

This is not to say that the Trust's experts were not highly regarded and knowledgeable legal professionals or that their testimony was entirely disregarded. On the contrary their testimony, as far as it went, represented a thoughtful and good faith analysis of the issues each was asked to address. However, the record is unequivocal that Mr. Stroyd presented the court with an extraordinarily thorough and insightful review of the copious time and billing records that, as noted above, are the core of this case, something that neither Mr. Bresnahan nor Mr. Marnen, by their own admission, chose to do.

In that regard Mr. Bresnahan testified that he did not see himself in the role of an auditor and did not look at each of

the numerous entries individually. Rather he observed that if he looked at a particular category of legal activity and if the amount charged or time involved seemed reasonable he would accept it as such. Mr. Bresnahan's opinions appeared to be less the result of a careful analysis of the evidence than, at times, a product of sweeping generalization. Similarly, Mr. Marnen, who provided candid and forthright testimony with regard to the invoices of TMG, noted that he did not look at the specifics of each bill to see, for example, if too many lawyers might be involved in a particular matter. None the less he concluded that attorney staffing levels by TMG were appropriate. Mr. Marnen testified that he did not carefully assess the time expended or activity engaged in by each of the various timekeepers but rather obtained a general idea and on that basis reached his conclusions. Neither Mr. Marnen nor Mr. Bresnahan gave any serious consideration to the ability of the Trust to shoulder the costs of its legal fees and expenses, a factor specifically identified in Pennsylvania law as an important consideration in determining an appropriate award in a case of this kind.

Significantly, Mr. Stroyd testified that he had extensive experience in assessing and determining proper attorney billing practices. He was a former partner at Reed Smith LLP a large law firm with an international presence, where, like Mr. Bass, he served as the head of a practice group and where he was directly involved in training young lawyers in proper billing practices. Moreover, he has had considerable experience in reviewing the billing practices of outside counsel for whom he had supervisory responsibility. Mr. Stroyd also testified that he served as special master for the Federal District Court in Erie where he was charged with the responsibility of assisting the court in determining the resolution of a significant fee

dispute.

It was also readily apparent that Mr. Stroyd was very knowledgeable with regard to Pennsylvania law as it applied to this issue as well as the professional standards applicable to determining the reasonableness of legal fees. Most notably, however, Mr. Stroyd meticulously reviewed the time and billing records involved in this case, scrutinized each entry and methodically evaluated the appropriateness of the fees being charged.

The court finds that his analysis provided a reliable framework for evaluating the reasonableness of the Trust's request and that his opinions were for the most part firmly grounded on an accurate and detailed factual assessment.

It has been observed, and in this case directly advocated by Mr. Bresnahan, that it should not be the role of the court in a fee dispute to go over every entry in an attorney's billing records and assess the reasonableness of each. While Mr. Bresnahan may be theoretically correct he ignores the unusual circumstances of this case. This case demands particularly close scrutiny both because of the gross disparity between the amount fees and expenses paid by the Trust and those paid by Millcreek and the objectively modest value attributed to the real estate interest at issue. The absence of even a modicum of proportionality in that regard raises serious questions that must be convincingly addressed in a proceeding of this kind. In addition, this is a case where the tax payers of Millcreek Township are being asked to pay the Trust's legal bill and in the unique circumstances of this case, public policy demands a searching inquiry to avoid the potential for abuse.

D. Fee Analysis: The LaRocca Criteria

Amount of Work performed: There is nothing to suggest that the partners, associates and paralegals who represented the Trust did not engage in significant work activity. Millcreek has not suggested that this is an issue. In fact it is Millcreek's position that the opposite is true and that the amount of professional activity generated in the case was beyond what was required.

Character of Services: Without a doubt the services afforded the Trust by the attorneys retained by Ms. Hirt positively furthered her legal interests and encompassed a range of professional activities that were required by the nature of the legal issues and the process involved in the condemnation. There has been no suggestion that those activities were performed in any way other than consistent with generally accepted standards of professional practice.

Difficulty of the Problems: There was considerable testimony about the level of difficulty involved in a case of this kind where a governmental entity condemns property and the land owner mounts a defense against the taking. Mr. Bass and Mr. Bresnahan asserted that because eminent domain cases involving the use of preliminary objections are so rare few lawyers are equipped to deal with them. Each noted the time constraints that one is under when having to respond to a declaration of taking within the thirty days provided in the statute.[11] Indeed Mr. Bresnahan, without any convincing support, testified that there is no lawyer in Erie capable of handling such a case. Therefore, he opined it was necessary for Ms. Hirt to hire

---

11. Although the Eminent Domain Code requires that all preliminary objections be filed at one time within a thirty day period, it also provides that the court may grant an extension. 26 Pa.C.S. § 306. Here the trust filed its preliminary objections within 50 days because of a service issue and filed a second set, months later, in response to the amended declaration of taking.

Mr. Bass and his law firm who used a team approach to overcome the hurdles inherent in such litigation.

The reality is that the record is insufficient to demonstrate that, aside from recognizing that preliminary objections in such cases function as a threshold pleading that defines the legal and factual context of the case, there is anything unusually challenging about the condemnation litigation process per se. The balance of the litigation process, including discovery and trial practice, is essentially the same as in any other civil case. Obviously a practitioner who represents clients in condemnation cases needs to understand the procedural rules that apply.

It is apparent, as the record reveals, that there is a belief among eminent domain practitioners that there is a low probability of success in challenging the government's legal authority to take property and that an attorney's experience in handling such cases is clearly advantageous to a client. This notion has not been challenged by Millcreek. And it goes without saying that representation by a skilled and experienced attorney is a distinct advantage to a litigant in almost any circumstance. Obviously some condemnation cases are more complex than others and require an unusual degree of practice sophistication. But here the credible evidence is insufficient to conclude that the Trust's case was, from a legal perspective, unusually complex. In fact it was quite straightforward; the Trust did not want Millcreek to take an easement interest in a very small portion of its property for the purpose of making improvements to a storm water management system. The fact that the process of reaching some kind of conclusion was attenuated and involved an inordinate number of lawyers and parallel litigation, does not necessarily implicate unusual legal complexity.

It is important to distinguish between matters whose intrinsic complexity demands a very special skill set from matters made complex by the ingenuity of the a team of lawyers. With sufficient resources the course of litigation can be shaped to be much more responsive to a litigant's interests however those interests may be defined by the client. For example, and as Mr. Bresnahan, observed, with the right attorney one can "overwhelm" an opponent with discovery. Here bringing to bear a "team" approach that utilized numerous attorneys and support staff from various legal disciplines went a long way in shaping the character of the litigation. Whether it was necessitated by the complexities inherent in either the litigation process or the underlying legal issues is quite another matter. In that regard the record is not convincing. Although the Trust filed preliminary objections challenging the taking only two played a role in the resolution of the case. The others were never adjudicated and in the posture of this current dispute there is not possible to determine whether the balance of the preliminary objections had any merit. Quantity alone is not determinative or for that matter, necessarily indicative, of complexity.[12]

------

12. Many of the trusts preliminary objections simply repeat the same argument. Compare, e.g., trust's prelim. objections at ¶¶ 25, 27-28 (stating "The permit is invalid because the project does not comply with the Pennsylvania Clean Streams Law and the regulations and guidelines thereunder;" "The permit is invalid because the project does not comply with the Pennsylvania Storm Water Management Act and the regulations and guidelines thereunder;" and "The permit is invalid because the project does not comply with the federal clean water act and the regulations and guidelines thereunder") with trust's prelim. objections at ¶ 33 (stating, "The permit is invalid because the project violates the clean streams law, the storm water management act, and the clean water act."

Four pages and 29 paragraphs of the preliminary objections to the amended declaration of taking relate entirely to the trust's position that the DEP's permit allowing the project to go forward is invalid. As but one example of the redundancy in the factual and legal assertions in the document, paragraphs 29, 30, 53 and 54 all contain identical factual averments.

The hearing before Judge Dunlavey is instructive. It required far less court room time than the trial of the issue at bar, with less than five hours of testimony and a total of four witnesses. As the court's memorandum opinion relates the outcome was significantly influenced by the results of a field test to determine where the water course was located in relation to the location of the proposed project. Memorandum opinion at. 5. At the hearing the Trust was represented by three lawyers from FR and one from TMG. In just the week surrounding the hearing, December 8 thru December 16, 2009, the attorneys for FR billed the Trust for over 300 hours for four lawyers to prepare and attend the hearing.

This is not to say that the challenge to Millcreek's condemnation was a simple matter. The Trust's attorneys appeared to have left no stone unturned and challenged the condemnation on multiple fronts. However, it must be recognized that in the context of trying to evaluate the reasonableness of attorney fees paid by a litigant, evaluating the true complexity of a underlying matter requires a more searching inquiry with the burden of proof remaining with the petitioner. While this case certainly presented legal challenges that required competent legal representation, the question is whether the challenges were of such a nature as to reasonably require the inordinate amount of litigation expense sought for reimbursement. There was no showing that the complexity of the condemnation case required the involvement of the extraordinary number of attorneys and support that the Trust was willing to pay.[13]

13. The fact that TMG had amassed a file room of boxes of discovery material, as depicted by photographs entered in the record, without a more precise delineation of their role in the case, is not indicative of complexity.

The importance of the litigation: While the importance of the Trust's challenge to the taking of easement rights is of considerable consequence from Ms. Hirt's point of view, its significance beyond that is not at all apparent. Although she strongly believes that Project will lead to further flooding on her property and in the area generally, this is an issue that is strenuously contested by Millcreek. Whether worse flooding would result from the condemnation and subsequent channel improvements was not determined in the course of this litigation. Although it was asserted as a ground in the Trust's preliminary objections it was not pursued by the Trust at the time of the hearing in favor of a different and more limited approach. Moreover, given the grounds upon which the condemnation was reversed, the project may only be temporarily thwarted as a renewed declaration of taking supported by a revised project plan in compliance with the second class township code remains a possibility.

The degree of responsibility incurred: The evidence suggests that the attorneys for both firms accepted a significant degree of responsibility for the legal strategies adopted and management of the litigation. However, it was also apparent that Ms. Hirt played an ongoing role in the case and was an active participant in decision-making as events unfolded.

Whether a fund was created by the attorney: This criterion is a not applicable in this case.

The professional skill and standing of the attorneys: There is no question that the partners from FR and TMG who represented the Trust were highly skilled and experienced litigators. Both Mr. Bass and Mr. Hinerman are highly regarded in their respective fields of concentration. Mr. Bass is one of the foremost experts in the field of eminent

domain law in Pennsylvania and Mr. Hinerman has a comparable reputation in environmental law. Similarly Mr. McDonald is one of the most experienced and capable practitioners in Erie County with an outstanding reputation among members of the bar. Significantly Millcreek has not in any way suggested otherwise.

The results the attorney was able to obtain: The Trust prevailed in its effort to defeat the condemnation although it did so in a way that does not foreclose a future effort on the part of Millcreek to try again to obtain easement rights in order to improve the channel. In the end it was able to convince the court that the project was not in compliance with § 1513 and § 2702 of the second class township code because the project would be creating a new watercourse and a new system rather than widening and deepening an existing one or revising an existing system. In both instances the court's decision was based in large part on a finding that the intended path of the improved channel was outside the existing one. As the trial court noted "a plethora of preliminary objections have not been reviewed" including those that asserted that the taking was "arbitrary and capricious." Trial court memorandum opinion at 7-8. In these circumstances it is not possible to fully evaluate the significance of the favorable result to the Trust or to Millcreek. Sometimes resolution through litigation is no resolution at all.

This is not to conclude that the balance of the Trusts objections to the taking were either frivolous or even devoid of merit but to recognize that from the perspective of what was ultimately accomplished by the attorneys to further their client's practical and legal interests it's very difficult to assess the overall benefit. Although a great deal of effort was devoted to proving that the condemnation

was illegal because the underlying project would not effectively accomplish its intended goal that question remains entirely unresolved. Neither did the proceeding resolve the question of whether Ms. Hirt's view on the best way to improve the storm water management in area is correct. Most notably, the conditions, whatever they may be, that have caused flooding in the area for so long, affecting both Trust property and its neighbors, continue to exist.[14]

The ability of the client to pay a reasonable fee: The Trust now seeks reimbursement of approximately $2.4 million in attorney fees and costs. Ms. Hirt is the Trustee and sole beneficiary of the Angela Cres Trust and a very wealthy woman. The value of her estate comprised largely of a special class of shares in Erie Insurance is in excess of $380 million. Ms. Hirt can afford to pay for the best legal talent available and she paid the fees in this case as well as the fees in the other related cases without any difficulty and without any hesitation.

The amount of money or value of the property in question: The value of the real estate interest in question is approximately $9000. The parcel that was the subject of the taking was comprised of .618 acres of a 44 acre tract. While the Trust argues that much more was at stake than a small piece of land, it presented no evidence as to the

_____

14. Perhaps the Trust's other legal initiatives will bring some closure to these issues. Unfortunately, in the one other legal action that was brought to some kind conclusion it also failed to resolve the ultimate issue of what is the best approach to storm water management. The trust had challenged the DEP's granting of a permit for the project before the EHB. After lengthy litigation including a hearing before an administrative law judge the action culminated in the EHB suspending the permit and directing the DEP" to determine whether the project can be completed without resulting in flooding of downstream properties...". Nothing was concluded about the wisdom of the project. Condemnee's Exhibit M at 30.

pecuniary value of any future loss of any kind. For example the Trust took the position that the project would lead to further flooding on the Trust property and impair access to Trust property by making a driveway impassable but did not introduce any evidence concerning what the value of such a loss would be. Indeed the record reflects that alternative access to the property is available if necessary.

It further argued that there were safety issues to consider but other than Ms. Hirt's testimony that she was concerned for the wellbeing of her neighbors including Ms. Pomeroy, as well as the increased risk of disease as a result of the presence of standing water on the property, the Trust provided no proof in support of these concerns. Finally, Ms. Hirt's expressed concern, apparently stemming from her exposure to the insurance industry, that the project would expose her to personal liability for damage caused by additional flooding, remains entirely undeveloped in the evidentiary record.

This court accepts the notion, advanced by the Trust, that the value of the property per se may in an appropriate case be an incomplete indicator of the true value of what is at stake. However, it is insufficient to simply characterize the importance of what's at stake as the risk of "existential" loss, as one of the Trust's experts suggested and leave it at that. Where the government is taking private property for its own use there is always something subjectively intangible and even perhaps existential at issue. However, it remains incumbent on the petitioner to meet its burden of proving the exact nature of what is of compelling concern that justifies the financial commitment at issue. Here the Trust did not do that. For example, even assuming it will occur, the likelihood, frequency and character of the increased flooding of the channel, and

its economic and personal impact were not established in the underlying condemnation case or in this proceeding. They remain contested issues. In such circumstances assessing the value either personal or pecuniary, of these collateral consequences of the condemnation to the land owner or others becomes a function of speculation and diminishes their significance in the overall assessment of the reasonableness of attorney fees.

E. Fee Analysis: The Billing Practices of FR and TMG in Context

Having considered the *LaRocca* factors as they apply to this case the issue becomes whether the fees for which the Trust seeks reimbursement are reasonable. The findings with regard to the billing practices and time expended by the Trust's lawyers as set forth above take on particular significance because there is nothing in this court's *LaRocca* analysis that would seemingly support an extraordinary award of attorney fees as would be required to justify the time and billing excesses noted above.

Other than pointing to the outcome and blaming Millcreek for its vigorous defense of the Trust's claims the record is essentially silent as to any explanation why it was necessary and therefore, reasonable to hire two separate law firms and have an extraordinary number of attorneys and others involved on an ongoing basis in a condemnation case of this nature. There is no justification in the record for the large number attorneys participating in group meetings or for multiple attorneys and/or paralegals unnecessarily attending court appearances or for the extraordinary amounts spent on everything from travel to document reproduction. In general the Trust has failed to prove the reasonableness of the fees, costs and expenses it paid to its attorneys.

And of considerable significance is the fact the Trust, whose sole trustee and beneficiary is a person of extraordinary financial means, was in a position to expend virtually any sum it desired to further its legal interests. But simply because the Trust had no compunction about paying for a very costly level of service virtually without any critical scrutiny, and that included by almost any measure of reasonableness charges for non essential and redundant legal services as enumerated in this court's findings set forth above and otherwise reflected in the record, it does not mean the public must do so as well.

The underlying notion that fee shifting in an eminent domain case is appropriate arises out of a concern for the wrongful and unfair use of the governments' condemnation power and the need to make whole a property owner who has, without fault, been the victim of government overreach. A condemnation action is not like other forms of civil actions predicated on an alleged civil wrong or other violation of law. None the less making the aggrieved person whole by reimbursing the expense of successfully defending against government action does not require paying for fees and expenses not justified by the particular circumstances of the case, whether the property owner can afford them or not. So while affordability is a consideration here the amount awarded by the court is not simply a function of what the Trust can afford to pay but a determination that what Ms. Hirt chose to pay on behalf of the Trust was not justified by the evidence in the case.

Significantly, the task before the court to sort out from hundreds of pages of billing and time records the particular entries and amounts that would allow for a precise calculation of a reasonable fee is not possible given the nature of the evidence presented by the Trust. Once

challenged by Millcreek at the time of trial the Trust made little or no effort to present an explanation for the asserted excesses. In such circumstances the court, after weighing all of the relevant factors and constrained by the limitations of the evidentiary record, must settle on an outcome that reflects a reasonable degree of proportionality.

## Conclusion

On the basis of the factual findings and legal analysis set forth above, this court finds that the Trust is entitled to be reimbursed for fees, costs and expenses in an amount proportionate to what was expended by Millcreek with special consideration for the legal challenges inherent in having to defend against a governmental entity's significant power of condemnation as well as Millcreek's vigorous and zealous pursuit of its own position. While precisely quantifying the value of the government's advantage is not possible, given the accepted notion in the record that prevailing in cases such as this, even on a limited basis, is very challenging, a premium fee award roughly equal to Millcreek's fees and costs is reasonable. Therefore the court will enter an order providing that Millcreek reimburse the Trust in the amount of $517,868.

## ORDER

And now this 6th day of December 2014, upon consideration of the petition for fees, costs and expenses of condemnee, Angela Cres Trust of June 25, 1998 and following hearing thereon it is hereby ordered, Adjudged and decreed that the request is granted to the extent that Millcreek Township shall reimburse the Trust in the amount of $517,868.